## Case No. 16,938.

### The VICTORY.

[2 Spr. 226.] [1]

District Court, D. Massachusetts. Oct., 1863.

PRIZE—MARSHAL'S FEES—DISTRIBUTION OF PRIZE MONEY—SALVAGE—COTTON AS PRIZE—INTERNAL REVENUE TAXES.

1. When a vessel is taken by the secretary of the navy under the act of 1863 [12 Stat. 759], the marshal is not entitled to his fees as in the case of a sale, or to half commissions, as he is when the case is settled without a sale.

2. Distribution among vessels engaged in a capture.

3. Vessels which pick up enemy's goods thrown overboard during a chase, are entitled to them as captors, and not as salvors.

4. The claim of the wife of an officer of the prize to her private adventure rejected.

5. Cotton captured as prize, and in the custody of the marshal, under a warrant from the prize court, is not liable to be proceeded against for the internal revenue tax while in his custody.

In admiralty.

R. H. Dana, Jr., U. S. Atty., for the captors.

Mr. Sargent, Collector, in support of the tax.

SPRAGUE, District Judge. This prize, a steamer, was taken by the secretary of the navy, for the use of the navy, after she had been libelled and was in the marshal's possession. This was done under section 2, c. 86, of the act of 1863 (12 Stat. 759). That act authorizes the secretary of war or the secretary of the navy "to take any captured vessel, any arms or munitions of war or other material," either before or after the vessel shall have been sent in for adjudication, and requires the department for whose use it is taken to "deposit the value of the same in the treasury of the United States, subject to the order of the court in which prize proceedings shall be taken in the case." When it was known that the secretary was about to take the vessel, the United States attorney moved for appraisors. These were ordered, not as a preliminary to the taking, but for the benefit of the captors and claimants, that the court might have some evidence of the value of the property taken. This right to take, given by the statute, is absolute, and is to be exercised at the discretion of the secretary. Neither the judge nor any officer of the court has any duty to perform to effectuate the taking. It is not the appraised value which the secretary is to deposit, but the true value. The secretary is not bound to wait for an appraisement, or to make the deposit before taking the vessel; but may take the vessel at once, by an exercise of power delegated to him by congress, and has the duty cast upon him to make the deposit of the value.

The marshal charges a commission on the amount the secretary deposited in this case, on the ground that it is a sale of the vessel. This

is objected to by the United States attorney, on behalf of the captors, and the question is submitted to me. The act regulating fees gives the marshal a percentage "for sales of vessels or other property, under process in admiralty, or under the order of a court of admiralty, and for receiving and paying the money." Acts 1853, c. 80 (10 Stat. 164).

This is in no respect a sale. The marshal could not have sold the vessel to the secretary. He is liable to the court for the vessel; and in this transaction is protected by the fact, that the vessel has been taken from him by act of law. This is the return which he should make, and in this case has made, on his warrant. It appears that the secretary sent the sum of $65,000 to the marshal, which was the amount of the appraisement, with a kind of bill of sale, which said. "Bought of the marshal of the United States," &c., the steamer Victory, &c., for $65,000. This bill the marshal signed and returned to the department, and deposited the money with the assistant treasurer to the order of the court. He suggests that this transaction makes the process a sale, and that it was treated as such by the secretary of the navy. However the secretary and marshal may have proceeded, the transaction is not a sale. The marshal had none of the duties of a sale, nor, indeed, any act to perform in the premises, but to yield to the taking by virtue of the statute.

The marshal submits the further question whether, if not entitled to full commissions, as on a sale, he is not entitled to half commissions as in a case "where the debt or claim shall be settled by the parties without a sale of the property." I do not think this to be such a case. The "debt or claim," if there be one in this case, is not settled by the parties. The suit goes on to an adjudication, without settlement or compromise, only the money is substituted for the vessel. The secretary is to deposit "the value" in the treasury, not the value less commissions. If he deposits the money through any person as his agent, the compensation of that agent, whether it be the marshal or any one else, cannot be charged on the fund. The result is, that the marshal is not entitled to commissions in any form on the value of property deposited by the secretary of the navy under the authority of the act of congress.

In October, 1863, the vessel and cargo having been condemned for breach of blockade, and for being enemy's property, the question of distribution was presented to the court, and the following opinion given by

SPRAGUE, District Judge. The Victory, a fast and powerful steamer, deeply laden with cotton, had run the blockade off Wilmington. N. C., and was nearing Nassau, when she was seen by three cruisers of Admiral Wilkes's squadron. They pursued her, but only one. the Santiago de Cuba, was able to keep up with her. The other two, the Tioga and Octorora, dropped astern, and passed out of signal distance, and at last out of sight, and employed

themselves in picking up the deck-load of cotton which the Victory threw overboard in her attempts to escape. The Santiago de Cuba overhauled the Victory, and brought her to, after a chase of five hours, and after firing several shotted guns. At the time of the capture and for more than an hour before, the two other steamers were out of sight. They came up after the capture, and put on board the prize the cotton they had picked up. The commanders of the Tioga and Octorora do not claim to share in the steamer or the cargo found on board; and in this, I think, they rightly construe the statute, which limits participation to vessels within signal distance at the time of the capture. They claim to share as sole captors in the cotton they picked up, and, if not as captors, then as salvors.

I am of opinion that they are captors of this cotton. It was enemy's property thrown overboard during the pursuit, and had been carried through a blockade on that voyage. Salvage assumes that the title to the property remains in the owners, for whose benefit it is saved, and who may rightly claim it of the salvors or of the court. The owners of this cotton could do neither.

Mrs. Harriet A. Bird, wife of the purser of the prize, claims one bale of cotton and two barrels of spirits of turpentine, as her private property, and says that she left Wilmington in the Victory to return to Connecticut, her native state, and invested her money in these articles of merchandise as a means of getting it out of the country. Assuming it to be capable of proof that the merchandise was her sole and absolute property, and held by herself for the purpose she states, and that she did leave Wilmington for the purpose she now represents, she knowingly embarked it in a breach of blockade, and it must take the fate of war. Her husband, too, is a resident of Charleston, and continues to be a rebel in fact, engaged in violating our laws of peace as well as of war; and she calls upon the court to furnish her funds out of the prize with which to support herself, which will relieve her husband from that burden, and enable him the better to give his time and means to the aid of the Rebellion. The claim must be dismissed.

After the above decision was rendered, the collector of the internal revenue petitioned that the amount of revenue tax due on the cotton might be paid from the proceeds of the sale of the cotton.

SPRAGUE, District Judge. The cargo of the prize-steamer Victory, consisting chiefly of cotton, was brought into this district, a libel was filed, and a warrant issued to the marshal, by virtue of which he took possession. It was ordered to be sold by an interlocutory decree. The collector of the internal revenue demanded the payment of the tax on cotton, under section 75, c. 119 of the act of 1862 (12 Stat. 465). That section imposes a tax of one-half of one cent per pound "on all cotton held or owned by any person or persons, corporation, or association of persons; and such tax shall be a lien thereon in the possession of any person whomsoever." It seems that the regulations established by the commissioner of internal revenue provide that, when this tax is paid, tags shall be affixed to the bales by the collector, and a receipt given to the person making the payment; but when this sale was ordered, the collector had not been furnished with the tags. The question arose, whether the cotton was liable to the tax in the hands of the marshal; and it was thought that, to require it to be sold subject to the tax, when the evidence of payment, i. e. the tags, was not ready, might be an inconvenience to the purchasers, and so operate unfavorably upon the sale. The marshal agreed with the collector to pay the tax from the proceeds, and it was announced at the sale that the purchasers would not be called upon for the tax. The vessel and cargo have since been condemned, and distribution is about to be made; and the marshal asks to have the tax allowed and paid from the proceeds. This is objected to by Mr. Dana, in behalf of the captors. Mr. Sargent, the collector, has presented the subject, and been heard in behalf of the allowance. It is understood that, in this case, the cotton has long since passed into consumption, and cannot be traced, and that the tax cannot be collected unless from these proceeds.

The decision of this question depends upon whether the cotton was liable to be taken out of the hands of the marshal to satisfy this tax. The cotton was in the custody of the court as prize. It had been captured by order of the government, and this court called upon to determine whether it should be condemned or restored. If prize property is liable to be taken for this tax, it is so liable at any time from the moment it arrives in port. The collector may demand the tax, and, if not paid by the marshal, he may enforce the lien. And to this end it is contended that he has the right to take possession of it and sell it. Now, what would be the effect of this? Who is to pay the tax, and relieve the property? The marshal has no funds from which to pay the tax; and the court has none. It is not until the property is sold, and the proceeds collected, that there are any funds. Now, to provide a demand for payment upon official persons, who can have no means of paying, is nugatory. The result will be, that, in all cases, the collector must take the property from the court and sell it. But until adjudication, the court holds all prize property, as it were, in trust. The rights of neutrals are involved. International questions may arise. There is a right of appeal to the supreme court. The result of the adjudication may be a decree of restitution to the owners; and these owners may be neutrals, whose government may enforce their rights. The decree may entitle them to a specific restitution. If the prize court, following the practice allowed by the law of nations, has converted the property into money, the owner

must be satisfied with the proceeds; but it would be a dangerous anomaly, when the prize law authorized a specific restitution, to allow an officer of an executive department, not acting under the orders of the court, and not responsible to the court, to seize and sell the property for purposes having no relation to the law of prize, the rights of the parties, or the belligerent rights of the government.' There would also be many practical inconveniences in such a course. The documents by which the quantity, character, and history of the property are to be ascertained are in the strict custody of the court until a certain stage of the proceedings, not to be seen by the parties; and the court, responsible under the law of nations, would not be justified in delivering them to the collector, nor, under some circumstances, in permitting him to see them. Neither can this court exercise any control as to the manner in which the collector shall sell the property, the expenses he may subject it to, or the disposal he may make of the proceeds.

In this view of the effect of such a course, the language of the statute must be very clear, or there must be something like a necessity to sanction it. Neither a necessity nor a policy is apparent. This claim rests upon the assumption that the cotton is liable to this tax, and that, if not collected before the sale, it would be a lien thereon in the hands of the purchaser; whether such a lien would exist after the sale, or the purchaser in any way be liable for such tax, I express no opinion. But, supposing the assumption to be correct, and the cotton liable to the tax in the hands of the purchaser, I see no necessity, nor even reasons of policy, that would authorize the marshal to assume the payment of the tax. If the collector obtains the tax from the purchaser instead of from the marshal, the result is that the cotton sells for just so much less. The government gets its tax less the collector's commission in either event. It is the same thing to the purchaser, if he understands his position. The captor loses one-half the amount of the tax in either event; but if the purchaser pays the entire value, and the marshal pays the tax to the collector, the captors and the government lose also the marshal's commission on so much of the proceeds as represent the amount of the tax.

There are the strongest reasons of policy against this demand. It is of the utmost importance that prize property should be dealt with by a court recognized by the law of nations; and I cannot think that congress intended that the government should collect a tax for its own benefit out of its own property, or property for which it is responsible, by a proceeding so anomalous, and attended with so many dangers and inconveniences.

But the marshal, in good faith and in the exercise of his judgment, for the benefit of the sale, agreed that the tax should be paid from the proceeds; and the collector, in the faith of that, allowed the cotton to pass into consumption; and the captors, it is said, have had the

benefit of the arrangement. Still the marshal acted in an official, and not in a personal capacity. He may subject the cotton to expenses when necessary for its preservation; but this property could not have been taken out of his hands by the collector, and no necessity existed which could authorize him to make any contract subjecting the proceeds to this claim. The most that can be said is, that, by this arrangement, the purchaser, by being assured that he would not be liable to the lien, gave more for the cotton than he would if he was to receive it subject to that incumbrance; that is to say, that the marshal, for the sake of enhancing the price, undertook that the purchaser should be relieved from a burden that would be consequent upon his purchase. Now it cannot be admitted that a marshal can burden property in his hands by arrangements of this nature. They rest upon no necessity or policy, and might be carried to a dangerous extent if the principle were admitted. I am satisfied that the claim for the tax against the proceeds must be disallowed.